# In the United States Court of Federal Claims

| | |
|---|---|
| MOMENTUS SPACE, LLC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>CAPELLA SPACE CORPORATION,<br><br>Defendant-Intervenor. | No. 26-cv-0911<br>(Filed: November 23, 2026)[1] |

William M. Weisberg, Law Offices of William Weisberg PLLC, McLean, VA, for Momentus Space, LLC.

Joshua A. Mandlebaum, Civil Division, United States Department of Justice, Washington, D.C., for the United States. With him on the briefs were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, Corinne A. Niosi, Assistant Director, Lt. Colonel Jeffrey J. Hannon, Space Development Agency General Counsel, and Isabelle P. Cutting, Trial Attorney, U.S. Air Force.

Michael Danton McGill, Arnold & Porter Kaye Scholer, LLP, Washington, D.C., for Capella Space Corporation.

## MEMORANDUM OPINION

This case arises from a United States Space Development Agency ("SDA") solicitation issued pursuant to what is commonly referred to as its "Other Transaction" ("OT") authority. The pertinent portion of the solicitation sought proposals to develop two prototype space vehicles that would test radio frequency communications technology while orbiting the Earth. Plaintiff, Momentus Space, LLC ("Momentus"), submitted an unsuccessful proposal. It then

[1] The Court issued this decision under seal on October 26, 2026, and invited the parties to submit proposed redactions on or before November 9, 2026. The redactions are indicated in the decision by brackets and three asterisks, [* * *].

filed a bid protest with the Court, alleging that SDA erred in awarding an Other Transaction agreement ("OT agreement") to Defendant-Intervenor Capella Space Corporation ("Capella"). The parties dispute whether this Court has jurisdiction to review the bid protest and whether Momentus is entitled to the preliminary injunctive relief that it seeks.

Four motions are pending before the Court. Momentus has filed a Motion for a Temporary Restraining Order and Preliminary Injunction and a Motion to Supplement or Complete the Administrative Record. In response, the United States and Capella each filed a Motion to Dismiss and opposed the motion to supplement the administrative record. Having heard oral argument and reviewed the parties' briefs,[2] the relevant law, and the Administrative Record, the Court concludes that it lacks subject matter jurisdiction over Momentus's claims. Accordingly, the Court **GRANTS** the United States' and Capella's Motions to Dismiss, **DENIES** Momentus's Motion for Preliminary Injunction, **DENIES AS MOOT** the Motion to Supplement or Complete the Administrative Record, and **DISMISSES** the Complaint.

## BACKGROUND

### I. The Defense Department's "Other Transaction" Authority

Congress has authorized the Defense Department to conduct research and development projects through several different means. The Secretary of Defense and the secretaries of military departments may perform research and development projects:

> (1) by contract, cooperative agreement, or grant, in accordance with chapter 63 of title 31;
> (2) through one or more military departments;
> (3) by using employees and consultants of the Department of Defense;
> (4) by mutual agreement with the head of any other department or agency of the Federal Government;
> (5) by transactions (other than contracts, cooperative agreements, and grants) entered into pursuant to section 4021 or 4022 of this

---

[2] The following filings are relevant to this Order: Compl., ECF No. 1; Mem. in Supp. of Pl.'s Mot. for a TRO and Prelim. Inj., ECF No. 4-1 ("Mot. for Prelim. Inj."); Suppl. Mem. in Supp. of Pl.'s Mot. for TRO and Prelim. Inj., ECF No. 20-1 ("Suppl. Mot. for Prelim. Inj."); Pl.'s Mot. to Suppl. or Complete the Administrative Record, ECF No. 20-2 ("Pl.'s Mot. to Suppl. AR"); Def.'s Mot. to Dismiss, and Resp. to Pl.'s Mots. For Prelim. Inj. Relief, and for Deps., ECF No. 22 ("Def.'s Mot. to Dismiss"); Sandhoo Decl., ECF No. 22-1; Mot. to Dismiss Pl.'s Bid Protest Compl., ECF No. 23-1 ("Capella's Mot. to Dismiss"); Resp. to Pl.'s Mot. for a TRO and Prelim. Inj. and Resp. to Pl.'s Suppl. Mot. for TRO and Prelim. Inj., ECF No. 24 ("Capella's Resp."); Pl.'s Resp. to Def. and Def.-Intervenor's Mot. to Dismiss and Opp'n to Suppl. of the Administrative Record, ECF No. 25 ("Pl.'s Reply"); Def.'s Reply in Supp. of its Mot. to Dismiss, ECF No. 26 ("Def.'s Reply"); Def.-Intervenor's Reply to Pl.'s Resp. to Mot. to Dismiss, ECF No. 27 ("Capella's Reply"). Throughout, page citations to documents in the record refer to the document's original pagination.

> title; or
> (6) by purchases through procurement for experimental purposes pursuant to section 4023 of this title.

10 U.S.C. § 4001(b).

This case involves SDA's exercise of the authority, pursuant to section 4001(b)(5), to conduct research and development projects by "transactions (other than contracts, cooperative agreements, and grants)." That is commonly known as the Defense Department's "Other Transaction" authority. *See, e.g.*, Tab 3.0, AR 87. The Defense Department often refers to transactions conducted under this authority as "OTs" and calls the agreements governing those transactions "OT agreements." *Id.*; Tab 1.3, AR 16.

Additional statutory provisions governing OTs can be found in 10 U.S. Code sections 4021 and 4022. Section 4021 provides that "[t]he Secretary of Defense and the Secretary of each military department may enter into transactions (other than contracts, cooperative agreements, and grants) under the authority of this subsection in carrying out basic, applied, and advanced research projects." 10 U.S.C. § 4021(a). Section 4022 further specifies that certain Defense Department officials "may, under the authority of section 4021 of this title, carry out prototype projects that are directly relevant to enhancing the mission effectiveness of personnel of the Department of Defense or improving platforms, systems, components, or materials proposed to be acquired or developed by the Department of Defense, or to improvement of platforms, systems, components, or materials in use by the armed forces." *Id.* § 4022(a). The section prohibits agency officials from entering into OTs for prototype projects unless one of the following four conditions is met:

> (A) There is at least one nontraditional defense contractor or nonprofit research institution participating to a significant extent in the prototype project.
> (B) All significant participants in the transaction other than the Federal Government are small businesses (including small businesses participating in a program described under section 9 of the Small Business Act (15 U.S.C. 638)) or nontraditional defense contractors.
> (C) At least one third of the total cost of the prototype project is to be paid out of funds provided by sources other than the Federal Government.
> (D) The senior procurement executive for the agency determines in writing that exceptional circumstances justify the use of a transaction that provides for innovative business arrangements or structures that would not be feasible or appropriate under a contract, or would provide an opportunity to expand the defense supply base in a manner that would not be practical or feasible under a contract.

*Id.* § 4022(d)(1)(A)–(D).

Section 4022 also allows for "follow-on production contracts or transactions." Specifically, "[a] transaction entered into under this section for a prototype project may provide for the award of a follow-on production contract or transaction to the participants in the transaction. . . . A follow-on production award may be provided for in a transaction entered into under this section for a prototype project, awarded with respect to such a transaction as one or more separate awards, or a combination thereof." *Id.* § 4022(f)(1). Such a follow-on production contract "may be awarded to the participants in the transaction without the use of competitive procedures . . . even if explicit notification was not listed within the request for proposal for the transaction if-- (A) competitive procedures were used for the selection of parties for participation in the transaction; and (B) the participants in the transaction successfully completed the prototype project provided for in the transaction." *Id.* § 4022(f)(2). An agency official may award a follow-on production contract or transaction "when the Department determines that an individual prototype or prototype subproject as part of a consortium is successfully completed by the participants." *Id.* § 4022(f)(3). OT agreements negotiated pursuant to section 4022 are treated as "Federal agency procurement[s]" for the purposes of the procurement ethics requirements set forth in chapter 21 of U.S. Code title 41. *Id.* § 4022(h).

## II. The HALO Acquisition Vehicle and Europa Program Solicitation

### *A. The HALO Program*

SDA created the Hybrid Acquisition for Proliferated Low-earth Orbit ("HALO") program through its OT authority in May 2024. Tab 3.0, AR 87. HALO is a contract vehicle through which SDA can "solicit rapid and affordable mission feasibility demonstrations." Tab 5.0, AR 98. It provides "a novel opportunity for non-traditional defense contractors to work directly with SDA for rapid on-orbit mission feasibility prototypes,"[3] and functions as an acquisition vehicle through which eligible participants can compete for future projects. Tab 5.1, AR 110. Specifically, "HALO consists of other transaction (OT) for prototype agreements but is novel in that it is a staged acquisition consisting of a competition to establish a pool of offerors who could then compete for specific demonstration efforts, or 'Prototype Orders (PO).'" *Id.*

[3] According to 10 U.S. Code section 4022(e)(2), the term "nontraditional defense contractor" is defined by 10 U.S. Code section 3014. Section 3014 states that:

> the term 'nontraditional defense contractor,' with respect to a procurement or with respect to a transaction authorized under section 4021(a) or 4022 of this title, means an entity that is not currently performing and has not performed, for at least the one-year period preceding the solicitation of sources by the Department of Defense for the procurement or transaction, any contract or subcontract for the Department of Defense that is subject to full coverage under the cost accounting standards prescribed pursuant to section 1502 of title 41 and the regulations implementing such section.

10 U.S.C. § 3014.

SDA issued a solicitation on May 31, 2024, for vendors interested in participating in HALO, and amended it June 25, 2024; the winners of the solicitation would be eligible to compete for future SDA prototype orders. SPACE DEVELOPMENT AGENCY, HYBRID ACQUISITION FOR PROLIFERATED LEO (HALO) PROGRAM SOLICITATION (2024), https://sam.gov/opp/ff4a47267ef04fe5af611e73444597da/view; Tab 5.1, AR 109–110. The competition was open to all non-traditional defense contractors ("NDCs"), but not traditional defense contractors. Tab 3.0, AR 87. SDA limited HALO in this way because "an important goal of the HALO acquisition is to increase the supply of vendors that are able to offer competitive bids on future Space Development Agency (SDA) spiral development Tranche competitions." *Id.* HALO claims to promote that goal by providing smaller, less risky demonstration missions to NDCs where they can gain experience working with SDA while increasing the technical maturity of their capabilities. *Id.* SDA reasoned that limiting HALO and the prototype orders associated with it to NDCs would "develop the industrial base" and that the limit that SDA was imposing was "similar to a limited competition justification to establish or maintain essential capabilities, which is authorized by the Federal Acquisition Regulations." *Id.* SDA also analogized it to "small business set asides, a very common procurement practice." *Id.*

Momentus and Capella are both NDCs and prime contractors participating in the HALO program. *See generally* Tab 1.3 (Capella's HALO OT agreement); Tab 2 (Momentus's HALO OT agreement). Consequently, they are both eligible to compete for OT awards issued through the HALO acquisition vehicle.

### *B. Europa Solicitation*

On July 1, 2025,[4] the SDA issued the Solicitation at issue in this case, Solicitation SDA-PS-25-04 ("the Solicitation" or "Europa Solicitation"), thereby establishing the "Tranche 2 Demonstration and Experimentation System (T2DES) Europa program" ("Europa" or "the Europa Program"). Tab 5.0, AR 98. The Europa Program was intended to facilitate improvements and technological advancements in radio frequency communications that could be leveraged in future SDA acquisitions of space vehicles. Tab 4.1, AR 92; Tab 5.0. AR 98 ("Future SDA constellations will leverage technologies and methods matured on the Europa [space vehicles]."); Tab 7.0, AR 186 (discussing issues with existing radio frequency communications systems and SDA's desired improvements to those systems). In layman's terms, SDA sought to improve the technological capacity to send and receive satellite communications despite radio frequency jamming. Tab 19.1, AR 871. The Solicitation sought contractor proposals for OT prototype orders to demonstrate those advancements. Tab 5.0, AR 98.

The Europa Solicitation was issued through the HALO acquisition vehicle pursuant to SDA's OT authority. Consequently, only HALO prime contractors, like Momentus and Capella, were eligible to submit proposals and compete for the OT award. *Id.*; Tab 4.1, AR 92. At oral argument, the parties represented that any future solicitations to procure space vehicles or other

---

[4] Although the solicitation was dated June 23, 2025, it was issued publicly on July 1, 2025. *See* Def.'s Mot. to Dismiss at 3 n.2 (explaining that SDA issued the Solicitation publicly on July 1, 2025, despite dating the Solicitation June 23, 2025).

items using the Europa Program's technological developments would not necessarily contain the same eligibility limitations.

The Europa Solicitation called for two separate competitions described as separate "tracks"—Track 1 and Track 2—and instructed offerors to submit proposals for only one of the tracks. Tab 5.0, AR 98–99. Momentus and Capella submitted proposals for Track 1, titled "Advanced Tactical Waveforms." *See generally* Tab 12.0 (Capella Track 1 executive summary submission); Tab 13.0 (Momentus Track 1 executive summary submission). Under Track 1, the SDA sought proposals for two contractor owned, contractor operated space vehicles. Tab 5.0, AR 98. The Solicitation also instructed offerors to provide options pricing for a second and third year of on-orbit operations and testing. *Id.* The awardee was expected to spend twelve to eighteen months developing and testing vehicles with the desired radio frequency communications technology and then launch the vehicles into space for at least one year of on-orbit testing of the technology. *Id.*; Tab 7.0, AR 186–88 (SDA's concept of operations for testing).

SDA represented that it would make the Track 1 award using a two-phased "down select" approach. Tab 5.0, AR 98. The Solicitation instructed offerors to first submit executive summary documents describing their proposed solutions. *Id.* Based on the executive summary documents received, SDA would select a subset of offerors to provide a full proposal. *Id.* If selected, an offeror would negotiate with SDA to establish a final agreement and submit a Statement of Work and Milestone Plan. *Id.*

## III. Evaluation of Proposals Submitted for Europa OT Awards

### *A. Executive Summaries*

As noted, interested contractors first submitted an executive summary. The executive summary had to address the spacecraft bus, payload, and ground system. *Id.*, AR 100. It also had to propose a schedule, discuss program management, and explain how the offeror's proposal could scale to support large, operational constellations of space vehicles. *Id.* Finally, the executive summary had to include a "not to exceed" price—including charges for the optional second and third years of on-orbit operations. *Id.*

SDA received executive summaries from ten offerors, including Momentus and Capella, by July 28, 2025. Tab 14.0 (summary tab); Tab 12.0; Tab 13.0. A Source Selection Evaluation Team ("SSET") evaluated the executive summaries. Tab 14.0, AR 682. On August 11, 2025, the SSET briefed the Source Selection Advisory Council ("SSAC") on its findings and recommendations. Tab 14.1, AR 683. Later the same day, the SSAC briefed the Selection Official ("SO"), Dr. Sandhoo, on the SSET's results. Tab 14.2, AR 736, 739. On August 12, 2025, the SO decided that Momentus, Capella, [***], and [***] would advance to the next phase and provide full proposals. Tab 14.3, AR 790–93. On August 15, 2025, SDA informed Momentus and Capella of this decision and gave both offerors feedback on their executive summaries. Tab 14.4, AR 794–96; Tab 14.5, AR 797–99.

### *B. Full Proposals*

Momentus and Capella were two of the four contractors that submitted full proposals to SDA. Full proposals were to include presentation slides and a written addendum addressing the CUI-level ("controlled unclassified information") portion of the Solicitation (a "written CUI addendum"). Tab 5.0, AR 104; Tab 7.2, AR 190–92. The presentation was to address the offeror's plan for program management, technical solution, schedule, price, past performance, and ground rules or assumptions. Tab 5.0, AR 102–04. Written CUI addenda had to include design descriptions for the antenna and radio frequency component, additional design descriptions for the radio and digital component, and other technical information. Tab 7.2, AR 190–92. Momentus and Capella gave presentations and submitted written CUI addenda on August 29, 2025. Tab 12.1, AR 306; Tab 12.4, AR 476; Tab 13.1, AR 509; Tab 13.4, AR 667.

The Solicitation required SDA to select a full proposal based on the proposals' "totality," including technical factors and price. Tab 5.0, AR 106–07. SDA would weigh, in descending order of importance, technical realism, technical solution, and vendor diversity. *Id.*, AR 106. It would then compare and equally weigh that evaluation with price. *Id.*, AR 106–07.

Capella offered a base price of $[***] and a not to exceed price (including all options) of $48,9[***]. Tab 12.1, AR 354. Momentus offered a base price of $[***] and a not to exceed price (including all options) of $[***]. Tab 13.1, AR 563. Capella's and Momentus's technical factors were evaluated as follows:

| | Factor 1 Technical Realism | Factor 2 Technical Solution | Factor 3 Vendor Diversity |
|---|---|---|---|
| Capella | Excellent | Good | Good |
| Momentus | Acceptable | Acceptable | Acceptable |

Tab 15.0 (summary tab).[5] On September 19, 2025, the SSAC briefed the SO on the technical evaluation and recommended Capella for the Track 1 award. Tab 16.0, AR 801, 808, 817.

## IV. Award Decision

On September 24, 2025, the SO determined that "Capella's better non-price factors overcome the differences in price" and authorized SDA to enter negotiations with Capella for a Track 1 award. Tab 16.1, AR 846–49. On October 2, 2025, SDA notified Momentus that its proposal was not selected to move forward to negotiations. Tab 16.3, AR 851.

---

[5] SDA's ratings of Capella's and Momentus's full proposals differed from its ratings of their executive summaries. At the executive summary stage, SDA rated Capella's Technical Realism, Technical Solution, and Vendor Diversity as "Good." Tab 14.0 (summary tab); Tab 14.3, AR 791. It rated Momentus's Technical Realism, Technical Solution, and Vendor Diversity as "Acceptable," "Good," and "Good," respectively. *Id.*

After negotiations with Capella regarding the specific statement of work and schedule, *see* Sandhoo Decl., ¶ 24, SDA awarded Agreement FA24012490081-P0001 to Capella for $39,116,090 on April 1, 2026. Tab 19.0, AR 863. On April 8, 2026, SDA notified Momentus that an agreement had been awarded and that Momentus could request feedback on its proposal. Tab 17.0, AR 852. Momentus requested feedback and received an outbrief on April 17, 2026. Tabs 17.1–17.2, AR 853–56. That outbrief provided the adjectival ratings assigned to Momentus's executive summary. *See id.*; *cf.* Tab 14.0 (summary tab); Tab 14.1, AR 693; Tab 14.2, AR 743. On May 8, 2026, Momentus received a second outbrief. Tab 17.3, AR 857–59. The second outbrief explained how Momentus's and Capella's adjectival ratings changed from their July 2025 executive summaries to their August 2025 full proposals. *Id.*

On June 1, 2026, in response to Momentus's concerns about the fairness and propriety of the SDA's decision, the SO issued a memorandum further explaining his rationale for his decision to pursue negotiations with Capella. Tab 18.0, AR 860–62. Among other things, the SO explained that, in his judgment, Capella's superior bus flight heritage placed it in a "different league of technical merit" than Momentus, and that that feature alone was worth paying Capella's higher price. *Id.*, AR 862.

### V. Procedural Background

Momentus filed its Complaint and motion for preliminary injunctive relief on June 24, 2026. *See* Compl.; Mot. for Prelim. Inj. Momentus later supplemented its request for injunctive relief and filed a motion to supplement the administrative record with deposition testimony. *See* Suppl. Mot. for Prelim. Inj.; Pl.'s Mot. to Suppl. AR. SDA filed a response opposing Momentus's preliminary injunction motion and moved to dismiss the Complaint for lack of subject matter jurisdiction. *See* Def.'s Mot. to Dismiss.

Capella intervened in the case on July 2, 2026. *See* Order, ECF No. 14. Subsequently, Capella moved to dismiss the Complaint for lack of subject matter jurisdiction and opposed Momentus's request for injunctive relief. *See* Capella's Mot. to Dismiss; Capella's Resp.

SDA's and Capella's motions to dismiss, Momentus's motion for injunctive relief, and Momentus's motion to supplement the administrative record with deposition testimony are all fully briefed and ripe for resolution. The Court also heard oral argument on the pending motions.

## LEGAL STANDARDS

### I. Motion to Dismiss for Lack of Subject Matter Jurisdiction

United States Court of Federal Claims Rule ("RCFC") 12(b)(1) governs motions to dismiss an action based on lack of subject matter jurisdiction. When resolving such a motion, the Court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in the plaintiff's favor. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). But if jurisdictional facts are disputed, the Court may consider

other relevant evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). Ultimately, plaintiffs bear the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Id.* at 748. If the Court determines that it lacks subject matter jurisdiction, it must dismiss the action. RCFC 12(h)(3).

### II. Motion for Preliminary Injunction

Preliminary injunctive relief is an "extraordinary remedy." *Associated Energy Gp., LLC v. United States*, 172 Fed. Cl. 799, 812 (2024) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)). To obtain that remedy, the moving party must establish: a likelihood of success on the merits, that irreparable harm would ensue absent relief, that the balance of hardships favors relief, and that relief supports the public interest. *Id.* (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)). Courts may not grant injunctive relief in cases where they lack jurisdiction. *See Celgard, LLC v. LG Chem, Ltd.*, 624 F. App'x 748, 751 (Fed. Cir. 2015). Accordingly, before reaching the merits of the preliminary injunction analysis, the Court must "[a]t a minimum, … determine that there is a 'substantial probability' that it has jurisdiction over the [underlying] claim[.]" *Id.*

## DISCUSSION

Before reaching the merits of Momentus's preliminary injunction motion, the Court must determine whether it has jurisdiction to review Momentus's claims. *See id.* The parties dispute whether the Tucker Act, 28 U.S.C. § 1491, gives this Court jurisdiction to review the OT agreement between SDA and Capella. That turns on whether the underlying Solicitation and award constitute or are connected to a "procurement" or "proposed procurement." The United States and Capella contend that the Europa Solicitation and award are neither a procurement nor connected to one, and thus urge the Court to dismiss the Complaint. Momentus counters that the Europa Solicitation and award are merely interim steps on a path toward a procurement contract to acquire space vehicles with new communications technology, and therefore its claims are within the Court's bid protest jurisdiction. For the reasons discussed below, the Court finds that it lacks subject matter jurisdiction and must dismiss Momentus's Complaint.

### I. Overview of Statutory Provisions and Caselaw Regarding Whether OT Agreements Fall Within this Court's Tucker Act Jurisdiction

The Tucker Act authorizes the Court of Federal Claims to render judgment "on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C § 1491(b)(1). "The concluding phrase 'in connection with a procurement or proposed procurement' applies to each jurisdictional prong, giving this Court 'broad' authority 'over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement.'" *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 288 (2025). Put simply, the Tucker Act is "in its entirety . . . exclusively concerned

with procurement solicitations and contracts." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010).

The Tucker Act does not define procurement, thereby leaving room for disagreement about which solicitations and transactions are within its scope. The Federal Circuit has adopted the definition of procurement codified at 41 U.S.C. § 111 to determine whether a "procurement" or "proposed procurement" has occurred. *See Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (citing 41 U.S.C. § 403(2) (currently codified at 41 U.S.C. § 111)). That statutory provision defines "procurement" to "include[] *all stages of the process of acquiring property or services*, beginning with the process for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 111 (emphasis added).

The Federal Circuit also examined the meaning of "procurement" in *Hymas v. United States*, 810 F.3d 1312 (Fed. Cir. 2016). There, the Federal Circuit declined to rely solely on 41 U.S.C. § 111 when deciding whether Fish and Wildlife Service ("FWS") cooperative farming agreements ("CFAs") were procurement contracts subject to the Court's jurisdiction or cooperative agreements exempted from it. *Id.* at 1324–25. Instead, it reviewed the definitions of "cooperative agreement" and "procurement contract" set forth in the Federal Grant and Cooperative Agreement Act ("FGCAA"). *Id.* Under the FGCAA, an instrument is a procurement contract if "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government." *Id.* at 1325 (quoting 31 U.S.C. § 6303(1)). Instruments are cooperative agreements if the agency "principally intended to 'transfer a thing of value' to the private [party] 'to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit of or use of the United States Government.'" *Id.* at 1327 (quoting 31 U.S.C. § 6305(1)). The Federal Circuit reasoned that the CFAs were not procurement contracts because FWS had not intended to acquire farming services for the United States Government's direct benefit or use. *Id.* at 1328. Rather, FWS had principally intended to conserve wildlife in refuges—carrying out a public purpose authorized by law—by allowing farmers to grow food for animals on refuge lands. *Id.* at 1327–29. The fact that the CFAs would indirectly benefit FWS did not convert them into procurement agreements. *See id.* at 1328–29.

Neither *Hymas* nor *Distributed Solutions* directly addresses whether and under what circumstances solicitations and agreements issued under the Defense Department's OT authority qualify as procurements or are connected to an actual or proposed procurement. Thus, the Court must look to nonbinding rulings from other Court of Federal Claims judges to ascertain whether it has jurisdiction over Momentus's bid protest.

Given the absence of binding Federal Circuit precedent, Court of Federal Claims judges have grappled with whether Tucker Act jurisdiction extends to solicitations of proposals under OT authority; [6] the approaches and outcomes vary given the unique fact patterns of each case.

---

[6] *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 291–93 (2025), provides a comprehensive review of the cases in which the Court of Federal Claims has considered its jurisdiction over OT agreements. *Telesto Grp., LLC v. United States*, 176 Fed. Cl. 711, 727–36

*Compare Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 441–45 (2019) (finding no subject matter jurisdiction) *with Raytheon Co.*, 175 Fed. Cl. at 291–94 (finding subject matter jurisdiction) *and Indep. Rough Terrain Ctr., LLC v. United States* ("*IRTC*"), 172 Fed. Cl. 250, 256–60 (2024) (finding subject matter jurisdiction). *Raytheon* formulated a jurisdictional standard that focuses on the "federal agency's immediate endgame" and concludes that this Court's bid protest jurisdiction encompasses OT agreements that are "intended to provide the government with a direct benefit in the form of products or services." 175 Fed. Cl. at 293–94. Ultimately, Judge Bonilla concluded that the challenged OT award was intended to facilitate the development, production, and government's acquisition of a missile defense system, and therefore was within the Court's jurisdiction. *Id.* at 294. Judge Davis applied a similar standard in *IRTC*, reasoning that "the relevant inquiry requires the Court to look at what the Government is seeking through the solicitation of proposals." 172 Fed. Cl. at 258. The solicitation at issue in *IRTC* was issued after prototypes had been made (i.e. a "follow-on production contract") and was designed to "acquire for the benefit of the Army the goods and services proposed . . . as part of the prototype phase." *Id.* Accordingly, it was within this Court's bid protest jurisdiction. *See id.* In *Telesto*, Judge Hertling observed that the jurisdictional analysis must begin with determining the "'principal purpose of the relationship' between prototype program participants and the [government agency]." 176 Fed. Cl. at 731; *see also id.* at 732 ("Examining an OT's principal purpose determines whether the OT can effectively itself be or include a proposed procurement."). He concluded that the OT award before him was "in connection with" a procurement because the Army had decided to acquire a successful prototype with a follow-on production contract; at that stage, acquisition was the principal purpose. *Id.* at 732.

Although most judges examining the Court's jurisdiction over OT agreements invoke the *Hymas* "principal purpose" test, their opinions diverge regarding the degree to which the intent to acquire a good or service must be actualized (if at all). As mentioned above, one of the statutory provisions authorizing OT agreements allows for "follow-on production contracts or transactions." 10 U.S.C. § 4022(f)(1). Relying on this authority, Defense Department officials sometimes plan research and development projects with one stage where they solicit experimental prototype projects and another stage where they purchase the outcomes of those projects from offerors through a follow-on production contract; OT agreements govern the arrangements at each stage. *See id.* § 4022(f)(3) (authorizing a follow-on production contract or transaction when the Defense Department determines that a prototype project is successful). In *Telesto*, Judge Hertling concluded that the acquisition of goods or services becomes the "principal purpose" of an OT solicitation of prototypes only after "the prototype process is completed successfully, and the agency decides to move forward to procure the prototype." 176 Fed. Cl. at 732–33. Before that point, during the prototyping stage, the agency's principal purpose may be promoting research and development. *See id.* at 732. *Raytheon*, in contrast, held that the lack of a formal commitment to purchase the prototype is not dispositive of the jurisdictional issue. 175 Fed. Cl. at 294. Judge Bonilla deemed this principle particularly true when the prototypes are "ill-suited for acquisition and use by the general public," and further observed that the record in *Raytheon* demonstrated that the agency "ha[d] every intention of awarding a follow-on production contract to [the selected contractor] in the event the defense

---

(2025), contains a similarly robust analysis and is the most recent opinion addressing the Court's OT agreement jurisdiction.

contractor's proposed solution [was] proven." *Id.* Similarly, in a case where a contractor's lack of success in the OT solicitation could exclude it from participating in a follow-on contract, Judge Holte found that an OT agreement initiated the procurement process and was connected to the proposed procurement even before the follow-on contract had been awarded. *See Hydraulics Int'l, Inc. v. United States*, 161 Fed. Cl. 167, 176–79 (2022).

## II. Whether this Court Has Jurisdiction to Review Momentus's Challenge to the SDA OT Award

The parties advance competing approaches to determine whether the Tucker Act gives this Court jurisdiction to review the SDA's OT award. The United States contends that OT solicitations, by definition, can never be procurements, and, alternatively, that this specific OT award is not a procurement. *See* Def.'s Mot. to Dismiss at 16–22; Def.'s Reply at 2–8. The United States also urges the Court not to apply the intent-based jurisdictional test articulated in *Raytheon*. *See* Def.'s Reply at 8–10. Capella acknowledges that the Court may have jurisdiction over OT awards if they relate to a procurement contract but asserts that no such link exists here. *See* Capella Mot. to Dismiss at 8–13. Capella further argues that even if the Europa Solicitation were connected to a procurement, the Court would lack jurisdiction because Momentus has not alleged a violation of a procurement statute or regulation. *See id.* at 14. Momentus contends that SDA "repeatedly indicated to offerors that this OTA was in a more or less direct throughline to follow-on procurement contracts for upcoming SDA payloads," and that the Court therefore has jurisdiction under *Raytheon* and *Telesto*. Pl.'s Reply at 6.

The Court rejects the Government's contention that all OT solicitations and awards are outside this Court's Tucker Act jurisdiction. The United States posits that OT agreements cannot be procurements because OT transactions are statutorily defined as something "other than contracts, cooperative agreements, and grants." *See* Def.'s Mot. to Dismiss at 18–20 (citing 31 U.S.C. § 6303); *see also* 18 U.S.C. § 4021(a); 10 U.S.C. § 4001(b)(5). It notes that section 4001(b)(1) allows the Secretary of Defense to perform research and development projects "by contract, cooperative agreement, or grant, in accordance with chapter 63 of title 31," *i.e.*, 31 U.S.C. § 6303 of the FGCAA. *See* Def.'s Mot. to Dismiss at 18 (quoting 10 U.S.C. § 4001(b)(1)). FGCAA section 6303 directs executive agencies to use "procurement contracts" when the "principal purpose of the instrument is to acquire . . . property or services for the direct benefit or use of the United States" or if "the agency decides in a specific instance that the use of a procurement contract is appropriate." 31 U.S.C. § 6303. The United States asserts that section 4001(b)(1)'s reference to "contract" must therefore be construed to refer to a "procurement contract," so that "contract" has the same meaning under both provisions. *See* Def.'s Mot. to Dismiss at 19. It concludes that OT agreements are something "other than *procurement contracts*," and consequently, not covered by the Tucker Act. *See id.* at 19–20 (emphasis added).

None of the relevant precedent adopts the United States' proposed statutory interpretation, and for good reason. Section 4001(b)(1)'s reference to the FGCAA provision discussing "procurement contracts" does not support reading the word "procurement" into section 4001(b)(5)'s definition of OT agreements as something "other than contracts." Indeed, if Congress wanted to make "contract" and "procurement contract" coterminous, it could have said that "contract" should be *defined* "in accordance with chapter 63 of title 31." It is more logical

to read the reference to the FGCAA to mean that if research and development projects are entered into "by contract, cooperative agreement, or grant," they should comply with the FGCAA, which provides guidance for executive agencies acquiring property and services from contractors through those legal instruments. *See* 31 U.S.C. § 6301 (defining purpose of FGCAA); *see also id.* §§ 6302–6309. The fact that section 4001(b)(5), which defines OT agreements, does not reference the FGCAA further undermines the Government's interpretation.

The United States also mistakenly assumes that OT agreements must be "procurement contracts" to fall within this Court's jurisdiction. The Tucker Act confers jurisdiction to review certain challenges to decisions made "in connection with a procurement or a proposed procurement." 28 U.S.C § 1491(b)(1). "Procurement" encompasses "*all stages of the process of acquiring property or services*, beginning with the process for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 111 (emphasis added). At the earlier stages, no "procurement contract" exists. A "proposed procurement" also presents a situation where no "procurement contract" exists. Nonetheless, the Federal Circuit has confirmed that this Court may review certain pre-procurement decisions. *See Distributed Sols., Inc.*, 539 F.3d at 1345–46 (noting that "the phrase 'in connection with a procurement or proposed procurement' by definition involves a connection with any stage of the federal contracting acquisition process"). Likewise, Court of Federal Claims judges have found jurisdiction to review challenges to OT awards that are connected to a procurement or proposed procurement, even if the OT agreement is not itself a procurement contract. *See, e.g.*, *Hyrdaulics Int'l, Inc.*, 161 Fed. Cl. at 176 (noting that "it is undisputed that the OTAs themselves are not procurements . . . [t]hus the Court focuses its analysis on 'these OTA's connectivity to a procurement or proposed procurement'" (citations omitted)); *Kinemetrics, Inc. v. United States*, 155 Fed. Cl. 777, 785 (2021) (finding jurisdiction to review OT solicitation because it was "in connection with a procurement" or proposed procurement). In sum, "that the statutory OT provisions describe OT agreements as something other than a procurement contract (or cooperative agreement or grant) does not mean the statute is describing OT agreements as something other than a procurement as defined by 41 U.S.C. §111." *IRTC*, 172 Fed. Cl. at 258. Accordingly, the Court declines to adopt a categorical rule that Tucker Act jurisdiction does not apply to OT agreements.

The Court will center its analysis of the Government's jurisdictional defense on whether the "principal purpose" of the Europa Solicitation is the acquisition of goods or services. If it is, the Solicitation can fairly be said to be connected to an actual or proposed procurement. That approach comports with Congress's definition of procurement as "the process of acquiring property or services," 41 U.S.C. § 111, and the Federal Circuit's interpretation of that statutory language in *Hymas*. *See IRTC*, 172 Fed. Cl. at 258; *Telesto*, 176 Fed. Cl. at 731–36.

The parties contest whether the acquisition of space vehicles with new communication technology is the principal purpose of the Europa Solicitation and resulting award. The United States and Capella contend that "[t]he purpose of the project / agreement with Capella is to build two prototype spacecraft and then use them to 'test,' or 'demonstrate,' certain communications technologies." Def.'s Mot. to Dismiss at 20–21 (citing Tab 19.1, AR 871–72, 874–75); *see* Capella's Mot. to Dismiss at 13. The only goal at this stage, the Government insists, is to determine whether the desired form of radio frequency communication is successful so that SDA

knows whether the technology could prove valuable in the future. *See* Def.'s Mot. to Dismiss at 20–21; *see also* Sandhoo Decl. ¶ 12. If the new radio frequency waveform is successful in the current Europa Program testing, SDA might require that space vehicles purchased under a future solicitation have the technology. *See* Def.'s Mot. to Dismiss at 21; *see also* Sandhoo Decl. ¶¶ 12–14. Momentus disagrees and characterizes the Solicitation as "part of a th[]rough line to specific procurement contracts, rather than any type of stand-alone development or similar effort." Mot. for Prelim. Inj. at 9.

The record shows that technological research and the development of potentially valuable communications technology is SDA's principal purpose at this stage. Mr. Sandhoo attests that "HALO orders (including HALO Europa) are not intended to provide capabilities for use by warfighters. Rather, they are for developing and testing prototypes." Sandhoo Decl. ¶ 12. Capella's OT agreement directs it to design, launch, and operate the two space vehicles specifically "to demonstrate advanced tactical waveform performance, adaptive beamforming, and secure tactical communications in low Earth orbit." Tab 19.1, AR 871. And Capella's objective is not just to deliver space vehicles equipped with the new communications technology, but to "[c]onduct an end-to-end on-orbit demonstration to validate waveform performance against program thresholds." *Id.* At the end of this demonstration, "[t]elemetry and performance data will be delivered to the Government for analysis." *Id.*, AR 872. Moreover, the concept of operations in the Europa Program Statement of Objectives specifies how this data should be gathered, suggesting a deeper level of government involvement akin to government-funded research. Tab 7.0, AR 186–88; *cf. Hymas*, 810 F.3d at 1328 (explaining that CFAs are not procurement contracts in part because they allow for ongoing FWS direction of farmers' day-to-day activities). Indeed, the SDA Director attests that "SDA plans to invest in industry to create a diverse pool of vendors that can mass-produce the type of SVs needed for the [Proliferated Warfighter Space Architecture] mission." Sandhoo Decl. ¶ 8.

Judges on this Court have found this kind of open-ended, industry-development work to be distinct from agency procurements. For example, in *Space Exploration Technologies Corporation*, the Court found that an OT-based project dedicated to developing space vehicle launch system prototypes was not "in connection with" a procurement in part because it was intended to create a pool of launch systems available for both commercial and government use. 144 Fed. Cl. at 437–38, 444–45. Similarly, in *R & D Dynamics Corporation v. United States*, the Court found that a Small Business Innovation Research program solicitation did not involve a contract for procurement because it was primarily intended to promote technological innovation by small businesses and meet federal research and development needs. 80 Fed. Cl. 715, 720–22 (2007), *aff'd*, 309 F. App'x 388 (Fed. Cir. 2009).

Neither the Europa Solicitation nor the final OT agreement with Capella indicates that the primary purpose of the Solicitation is for SDA to acquire a successful prototype. The Europa Solicitation, the Europa Program Track 1 Statement of Objectives, and the Statement of Work in Capella's OT agreement all emphasize that the space vehicles will be contractor owned and operated. Tab 5.0, AR 98 ("This will be a Contractor Owned, Contractor Operated (COCO) arrangement."); Tab 7.0, AR 180 ("The selected performer (Offeror) will deliver two contractor-owned and contractor-operated (COCO) identical space vehicles (SVs) with payloads that meet the requirements of the SOO and CBRD."); Tab 19.1, AR 871 ("Work will be performed under a

fixed-price, milestone-based Other Transaction Agreement (OTA) on a Contractor-Owned, Contractor-Operated (COCO) basis.").

Neither the record nor the briefs indicate that SDA 'acquired' the underlying communications technology. At oral argument, Capella's counsel acknowledged that SDA would obtain some intellectual property as part of the agreement. However, the intellectual property rights at issue here are comparable to the patent and data rights that the Government commonly shares with contractors. *Compare* Tab 1.3, AR 21–22 (Capella OT Agreement defining rights including "Limited Rights," "Government Purpose Rights," and "Unlimited Rights"), 28–32 (Capella's patent rights terms), *and* 32–33 (Capella's data rights terms), *with* 48 C.F.R. § 252.227-7038 **(**Defense Acquisition Regulations System patent rights clause for large business contractors) *and id.* § 252.227-7013 (Defense Acquisition Regulations System technical data rights clause for non-commercial products and services).

To be sure, Capella's OT agreement gives SDA an indirect benefit by advancing the agency's overall mission—namely, "accelerat[ing] the development and fielding of new military space capabilities to ensure our technological and military advantage in space." Sandhoo Decl. ¶ 5. But that mission is a public purpose—not a tangible service or property acquired by the government. Consequently, that indirect benefit does not make the OT agreement a procurement. *See Hymas*, 810 F.3d at 1328 (finding that the fact that the CFAs would indirectly benefit FWS did not convert them into procurement agreements).

Moreover, the possibility of a follow-on contract is too speculative to make the acquisition of goods the principal purpose of the Europa Solicitation, or to establish a connection between the OT agreement and an actual or proposed procurement. The Solicitation does not even mention the possibility of a follow-on production contract for successful space vehicles, let alone state that the agency has decided to buy any. *See* Tab 5.0, AR 98–108. The work done under Capella's OT agreement will likely inform future SDA procurements, helping SDA decide whether to buy space vehicles equipped with the new communications technology. *See id.*, AR 98; *see also* Sandhoo Decl. ¶¶ 12, 13. But that eventual space vehicle procurement is entirely speculative, and SDA has not yet begun planning any potential future solicitations of equipment using the prototype technology. *See* Sandhoo Decl. ¶ 7 ("In the future, SDA hopes to solicit mass-produced [Proliferated Warfighter Space Architecture] satellites and space vehicles (SVs)."); *see also id.* ¶¶ 13–15. As Judge Hertling noted in *Telesto*, "[i]t is not enough that the agency contemplates a follow-on procurement at the outset of an OT for the project to be a proposed procurement subject to this court's jurisdiction." 176 Fed. Cl. at 733.

Significantly, there is no evidence that Capella will be the awardee in hypothetical future procurements. Nor does the award give the successful offeror a preference or express advantage for that future work. That distinguishes this case from others where courts found an OT solicitation to be "in connection with a procurement or a proposed procurement" because a contractor's non-selection for the OT award "c[ould] result in the exclusion of a bidder for consideration of 'a follow-on production contract.'" *Hydraulics Int'l, Inc.*, 161 Fed. Cl. at 179; *see also Kinemetrics, Inc.*, 155 Fed. Cl. at 785 (concluding that the court had jurisdiction to review an OT solicitation because an offeror's rejection in the offer-evaluation phase disqualified it from consideration for the planned follow-on production contract).

In sum, the record does not support Momentus's characterization of the OT agreement as "part of a thorough line [sic] to specific procurement contracts, rather than any type of stand-alone development or similar effort." Mot. for Prelim. Inj. at 9. In briefing and at oral argument, Momentus failed to provide record support for its assertion that "SDA has repeatedly indicated to Momentus" that the OT agreement was tied to specific procurement contracts. *Id.* The record excerpts that Momentus cites do not establish a connection between the Europa Program and a definitive future procurement. Momentus points to SDA's internal memorandum on the HALO Program, noting that SDA discusses the program as part of an effort to increase the number of vendors able to offer competitive bids on future SDA competitions. *See* Suppl. Mot. for Prelim. Inj. at 2 (citing Tab 3.0, AR 87). It also notes that the memorandum analogizes this effort to aspects of the Federal Acquisition Regulations. *Id.* Momentus next points to a notice that SDA issued to advertise a Europa Program Industry Day. *Id.* (citing Tab 4.1, AR 92). It emphasizes SDA's statement that the Europa Program technology advancements are "expected to translate into future SDA Transport Layer acquisitions." *Id.* (cleaned up). However, as Capella observes, "[a]t best, Momentus is merely anticipating that SDA might at some undetermined point consider issuing a follow-on production contract." Capella's Mot. to Dismiss at 13. "[T]he fact that resources expended by the government during one phase of a government program may lead to the development of the capacity to provide goods and services in the future does not, alone, render an award a 'procurement.'" *Space Expl. Techs. Corp.*, 144 Fed. Cl. at 444 (citing *R & D Dynamics Corp.*, 80 Fed. Cl. at 722). Consequently, the Court finds that there has been no procurement at this stage and that any future procurements remain too speculative to be deemed either the principal purpose of the Solicitation or a proposed procurement to which the Solicitation is connected.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** SDA's and Capella's Motions to Dismiss, *see* ECF Nos. 22, 23-1, and **DISMISSES** Plaintiff's Complaint, ECF No. 1. Because the Court lacks jurisdiction, the Court also **DENIES** Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 4, and **DENIES AS MOOT** the Motion to Supplement or Complete the Administrative Record, ECF No. 20-2. The Clerk is directed to enter **JUDGMENT** accordingly.

**IT IS SO ORDERED.**

ROBIN M. MERIWEATHER
JUDGE